OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 78-941—Decided May 9, 1979.)

*Mr. William A. Spratley,* consumers' counsel, *Mr Orla E. Collier* and *Mr. Stephen P. Allison,* for appellant.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik* and *Ms. Judith B. Sanders,* for appellee.

*Messrs. Porter, Wright, Morris & Arthur, Mr. Samuel H. Porter, Mr. Curtis Loveland* and *Mr. William J. Kelly, Jr.,* for intervening appellee Columbus & Southern Ohio Electric Company.

PAUL W. BROWN, J. Pursuant to R. C. 4903.13, the Supreme Court is required to reverse, vacate or modify final orders of the Public Utilities Commission only where, upon a consideration of the record, the order is unreasonable or unlawful. In ascertaining the reasonableness and lawfulness of commission orders, this court's scope of review has traditionally turned on whether an issue appealed from presents a question of law or one of fact.

As to questions of fact, this court has repeatedly enunciated the rule that orders of the commission will not be reversed unless they are manifestly against the weight of the evidence or are so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 370; *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, paragraph eight of the syllabus; *Cleveland* v. *Pub. Util. Comm.* (1965), 3 Ohio St. 2d 82, 84; *East Ohio Gas Co.* v. *Pub. Util. Comm.* (1940), 137 Ohio St. 225.

As to questions of law, however, this court has complete, independent power of review. Legal issues are accordingly subject to more intensive examination than are factual questions. But, this does not prevent the court from acknowledging and, in certain instances, utilizing the specialized expertise of an agency in interpreting the law. These situations arise where there exists disparate competence between the respective tribunals in dealing with highly specialized issues and where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly. It is in this sense that we perceive, and carry out, our function of determining the lawfulness and reasonableness of commission orders. With these rules of review in mind, we now address the issues raised by appellant.

The majority of the issues in this cause concern the allowance by the commission for construction work in progress (CWIP) in the company's rate base, pursuant to R. C. 4909.15(A)(1). This section provides, in pertinent part, as follows:

"* * * The commission may, *in its discretion*, permit a reasonable allowance for construction work in progress but, in no event, may any allowance for construction work in progress be made by the commission until it has determined, after a physical inspection, that the particular construction project is at least seventy-five percent complete." (Emphasis added.)

R. C. 4909.15(E) limits the amount of CWIP which can be included in the rate base, as follows:

"In no event shall an allowance for construction work in progress under division (A)(1) of this section exceed twenty per cent of the total valuation as stated in such division, not including such allowance."

Appellant argues that the commission abused its discretion under R. C. 4909.15(A)(1) in authorizing, by order, the inclusion of $100,531,000 for CWIP in the company's rate base. The maximum allowable CWIP under the statutory provisions would have been $156,865,000. Appellant urged the commission to include only $4,064,000.

R. C. 4909.15(A)(1) confers upon the commission discretion to permit a reasonable allowance for CWIP. In exercising this discretion, the commission determined that those projects which were completed by the end of the test year or which would be operational by the time the rates in dispute took effect, qualified as a reasonable CWIP allowance. The commission reasoned that the company or its investors should not "be required to wait until the next rate case to realize a return on property that will be providing service throughout the period during which the rates established in this case will be in effect". The commission also recognized that the purpose for supporting these statutes is "to provide the commission with a mechanism" by which authorized revenues could take into account expenses of plant construction "necessary to assure continuity of utility service."

The method adopted by the commission to implement this purpose does not appear unreasonable to this court. The commission acknowledged that the standard applied in this cause does not establish rigid criteria for the fu-

ture. In resolving this cause, the commission applied the method it believed could achieve a result approximating the intended purpose of the statute. This standard, based as it was on the particular set of facts before the commission, bore a reasonable relationship to the purpose of the legislation. Accordingly, this court finds that it was not an abuse of discretion for the commission to authorize the inclusion of $100,531,000 for CWIP in the company's rate base pursuant to R. C. 4909.15(A)(1).

Appellant argues next that to the extent any CWIP allowance is approved by the commission, there must be an offsetting credit to operating income for funds used during construction (AFUDC).

Without detailing the accounting principles involved herein, it becomes apparent that were such an entry required by the commission, the net effect would be to neutralize the CWIP inclusion, a result which would render R. C. 4909.15(A)(1) meaningless. Appellant's contention is, therefore, not well taken.

Appellant also attacks the commission's failure to specifically direct the company to cease capitalizing AFUDC on those construction projects authorized by the commission for inclusion in the company's rate base.

The record indicates, however, that company witnesses agreed to cease capitalizing construction projects included in the rate base. This complies with generally accepted accounting principles and Federal Energy Regulatory Commission accounting rules, 18 C. F. R., Part 101. This court can find no prejudice, and thus no reversible error, in the commission's failure to order the company to make an entry which the company intended to make anyway, by agreement and pursuant to standard accounting principles. See *Worthington Hills Civic Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 11.

Appellant's final challenge to the commission's inclusion of CWIP in the company's rate base attacks R. C. 4909.15 on the ground that the discretion granted to the commission under this statute is in effect so broad and im-

precise as to constitute an unlawful delegation of legislative authority. Also, the appellant seemingly charges that the commission's exercise of this discretion was so arbitrary as to deny ratepayers due process of law.

In *Matz* v. *J. L. Curtis Cartage Co.* (1937), 132 Ohio St. 271, this court held in paragraph seven of the syllabus:

"As a general rule a law which confers discretion on an executive officer or board without establishing any standards for guidance is a delegation of legislative power and unconstitutional; but when the discretion to be exercised relates to a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations."

R. C. 4909.15 involves the regulation of public utility rates and is, therefore, an exercise of the police power within the criteria established by *Matz*. *Akron* v. *Pub. Util. Comm.* (1948), 149 Ohio St. 347. The statute also contains legislative guidance, which *Matz* excuses for practical considerations, by placing specific limitations upon the discretion exercisable by the commission respecting CWIP allowances as follows: the commission must determine by inspection that CWIP is at least 75 percent complete before an allowance can be considered; and the amount of CWIP includable in the rate base cannot exceed 20 per cent of the total valuation of the rate base. CWIP allowances must also be reasonable. We believe these limitations adequately confine commission discretion. Further restriction would conceivably hinder the flexibility necessary to enable the commission to carry out legislative will. For these reasons, this court holds that the discretion granted the commission under R. C. 4909.15 to authorize a reasonable allowance for construction work in progress in a utility's rate base constitutes a lawful delegation of the state's police power by the General Assembly.

Appellant's contention that R. C. 4909.15 was unconstitutionally applied by the commission is answered by this court's holding that the commission acted reasonably in ascertaining a CWIP allowance for the company. Appellant's constitutional challenge is accordingly without merit.

Appellant argues next that the commission erred in failing to deduct customer deposits from the rate base pursuant to R. C. 4909.05(I) and (J),[1] or, alternatively, by failing to offset working capital with customer deposits, pursuant to paragraph five of the syllabus in *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395, which provides, in part:

"'* * * customers' contributions in the form of * * * deposits to secure the payment of customers' bills for service * * * which will be constant with reasonable certainty in the foreseeable future and which are available for investments in materials and supplies, or for use as working capital, should be used as an offset on the allowance for working capital * * *.'"

Offsetting working capital with customer deposits would have the same ultimate effect as deducting the deposits from the rate base.

The commission did not believe that customer deposits fit within the language of 4909.05(I) so as to justify a deduction under subsection (J). We neither accept nor reject this conclusion. The commission did not specifically address the problem of whether customer deposits should be offset against working capital, but the commission staff did propose two methods to determine rate base: the balance sheet method and the formula approach. The balance sheet method deducted customer deposits from working

___

[1] R. C. 4909.05(J) provides, in relevant part:

"The valuation of the property of the company shall be the sum of the amounts contained in the report pursuant to divisions (C), (D), (E), (F), and (G) of this section, less the sum of the amounts contained in the report pursuant to divisions (H) and (I) of this section."

R. C. 4909.05(I) provides:

"Any sums of money or property that the company may have received as total or partial defrayal of the cost of its property."

capital; the formula approach, which was adopted by the commission, did not.

This court is of the considered opinion that *Cincinnati* v. *Pub. Util. Comm., supra,* governs the issue before us. The rationale for an offset, as expressed in that decision, and as recognized by the commission in the context of R. C. 4909.05(I) deductions, is to permit investors to earn a return only on that property for which they have supplied funds, not on funds contributed by customers. The record indicates that customer deposits are relatively constant[2] and available for investment or use as working capital.[3] Accordingly, we find that the commission acted improperly in failing to offset working capital by customer deposits.

We are not suggesting by this finding, however, that the formula approach to rate base calculations as used by the commission in this cause need be rejected. We only require that due account be taken of customer deposits. If the formula is not designed to accommodate an offset to working capital, and we were not informed by the parties on this matter, then it may be necessary to deduct customer deposits directly from the rate base. The result would be the same. In *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm., supra* (42 Ohio St. 2d 403), this court reversed the commission's order for failure to deduct customer contributions in the form of tax accruals from working capital, based on the authority of *Cincinnati* v. *Pub. Util. Comm., supra.* In that case too, the commission employed a formula approach to determine the rate base. The use of a formula was not found by this court to be incompatible with requiring an offset to working capital, as we so hold here. Accordingly, the commission's order in this respect, being unreasonable and unlawful, must be reversed in part and

---

[2] The fact that customer deposits are retained on a short term basis does not significantly affect the long run level of deposits, which remains relatively constant.

[3] The ultimate use of customer deposits is not traceable, according to the parties. To require appellant to trace these funds would be an unreasonable burden. The test of *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395, requires only that these funds be available for the specified uses, as they were here.

remanded to the commission for any proceedings that may be necessary to determine the amount of customer deposits to offset against working capital and a proper method by which to make such an adjustment.[4]

Appellant urges next that the commission erred by permitting the amortization of deferred scrubber costs as test year expenses under R. C. 4909.15(A)(4) and (C).

The record indicates that this is a proper accounting procedure. Although these costs were paid prior to the test year, under principles of accrual accounting, they were deferred until the scrubber actually went into operation. The yearly amortized portion of these expenses was reflected on the company's books in the test year, and thus constituted a test year expense within the meaning of R. C. 4909.15(A)(4) and (C). Appellant's contention is rejected.

Appellant contends finally that the commission violated R. C. 4903.09 by not specifically setting forth in its opinion and order the portion of operation and maintenance expenses attributable to test year direct labor costs. R. C. 4903.09 provides, in part, as follows:

"* * * the commission shall file * * * findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact."

Although the commission admits that it did not specifically address the labor cost expense issue in its opinion and order, it did discuss the staff's recommendations in this area, which were adopted in modified form. As such, the commission substantially complied, pursuant to R. C. 4905.09, with the requirements of R. C. 4903.09.[5]

---

[4]We note that the staff recommended that $973,000 in customer deposits be offset against working capital under the balance sheet approach to rate base calculations. This figure does not appear unreasonable.

[5]R. C. 4905.09 provides, in part:

"A substantial compliance by the Public Utilities Commission with the requirements of chapters * * * 4903 * * * of the Revised Code is sufficient to give effect to all its * * * orders * * *. Such * * * orders * * * shall not be declared inoperative, illegal or void for an omission of a technical nature in respect to such requirements * * *."

For the foregoing reasons, the order of the commission is affirmed in part, and reversed and remanded in part for proceedings consistent with this opinion.

*Order affirmed in part and reversed in part.*

CELEBREZZE, C. J., HERBERT, W. BROWN, SWEENEY and HOLMES, JJ., concur.

LOCHER, J., concurring in part and dissenting in part. I concur in the portion of the majority opinion which holds that the Public Utilities Commission erred in failing to deduct customer deposits from the rate base pursuant to R. C. 4909.05(I) and (J), or, alternatively, by failing to offset working capital with customer deposits as required by paragraph five of the syllabus in *Cincinnati* v. *Pub. Util. Comm.* (1954), 161 Ohio St. 395.

As for the remaining portion of the majority opinion, I respectfully dissent.

With the passage of Am. Sub. S. B. No. 94, we enter into a new era of rate regulation in Ohio for electric utilities. The cause *sub judice*, which primarily concerns itself with the inclusion of CWIP, presents a novel question which will be the guide for future applications of rate base increases. In the instant cause approximately $20,000,000 of the $28,682,000 increase in revenue is attributable to the commission's decision to include $100,531,000 of CWIP in the rate base.

This case has great significance not only in the total amount of money involved in this case and in future cases, but more importantly because the commission so cavalierly authorized the inclusion of the CWIP in the rate base, which represents a suspect exodus from traditional regulatory principles. The commission noted the significant, precedential nature of this case when it stated:

"* * * [T]he Commission is still gaining experience in applying the new law and it is obvious that the parties to this proceeding perceive the importance of their role as

the Commission begins formulating new policies and examining the applicability of existing precedent."

Admitting the importance of this case, the commission awarded an unprecedented $100,531,000 in CWIP in the rate base, which was approximately $90,000,000 more than the staff had recommended. The great disparity between the amount ultimately awarded and the amount recommended by the staff coupled with the lack of enunciated standards by which the commission determined the amount to be awarded is a clear abuse of discretion by the commission.

Both the staff and the intervenor suggest that a cash flow problem must exist or that there must be a financial stress to justify the inclusion of CWIP in the rate base. The applicant's own witness, John F. Utley, testified that the utility company should only be permitted to include that amount of CWIP in the rate base which is sufficient to improve the cash flow. Consideration of a cash flow is admittedly a fundamental factor in allowance of CWIP in the rate base. Thus, the utility is not entitled to an automatic inclusion of CWIP in the rate base, but instead the commission should permit this inclusion only if the utility demonstrates the requisite need for the increase. This need should not be absolute upon a showing of financial stress. Financial deficiency, standing alone, should not become a carte blanche authorization for the utility to pass the increase on to its tariff customers. This is especially true when, as herein, policies and decisions caused the company to be in a financially deficient position and where the company can alleviate the situation without necessitating higher consumer rates.

Public utilities because of their monopolistic nature should be held to a higher standard in managing the affairs of the company. They, in effect, have a fiduciary duty to the public as well as to the shareholders. The public interest increases with a monopoly.

As Commissioner David Sweet so aptly discloses in his dissenting opinion:

"The Staff Report clearly documents the failure of C&SOE to obtain optimal levels of output from its capital stock—the company has the *worst performance record of any Ohio electric utility* in utilizing its capital or labor efficiently (both in terms of net generation per employee and net generation per dollar of net plant in service)."

The commission has a duty to require the company to justify its decisions before allowing the utility to pass the increase on to its tariff customers. The commission realized that the need for CWIP inclusion in the rate base was promulgated by questionable management policies and decisions, because its own staff brief noted that:

"If it is true that the Company faces a situation where it needs revenue relief to finance additional capacity construction, the past decisions of the company under its capacity planning philosophy have contributed significantly to this economic problem."

The commission is applying the "band-aid to the deep wound" in order to stop the more serious deep-rooted problems that will continue to plague the company. This "band-aid" remedy, which is the $100,531,000 inclusion of CWIP in the rate base, is but a mere forestalling of future rate increases. Commissioner Sweet states that the applicant has gone on record that it has the intention of filing additional increases in the near future.

The commission must promulgate criteria and standards that will force the utilities to justify their decisions and correct any judgmental error prior to raising the consumers' rates by the inclusion of CWIP in the rate base. A well-recognized legal standard is that "predictability * * * is essential in all areas of the law, including administrative law." *Cleveland Elec. Illuminating Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403, 431.

The commission claims its decision is based upon relevant facts in the record. However, the record is void of any guidance as to what those factors might be for future cases. It is well established that discretion is abused if it is exercised without rational explanation, inexplicably de-

parting from established policies. *Wong Wing Hang* v. *Immigration & Naturalization Serv.* (C. A. 2, 1966), 360 F. 2d 715, 719.

The commission has a two-fold duty to perform. First, it must establish standards for future decisions on issues of allowing CWIP in the rate base. Furthermore, the commission must initiate and direct the utility in the areas of capacity planning and utilization prior to allowing rate increases in the future.

This is especially crucial because this case will serve as a guide for future R. C. Chapter 4909 rate increases. I would remand this cause to the commission to establish standards as outlined above.