OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.,* 117 Ohio St.3d 289, 2008-Ohio-860.]

(No. 2007–0570—Submitted December 12, 2007—Decided March 6, 2008.)

O'CONNOR, J.

{¶ 1} This is an appeal as of right by appellant, Ohio Consumers' Counsel ("OCC"), from an order of the Public Utilities Commission of Ohio ("commission" or "PUCO"). The commission approved an application by Cincinnati Bell Telephone Company ("CBT") for alternative regulation of its basic local exchange telephone service in CBT's Cincinnati and Hamilton telephone exchanges. OCC appealed, arguing that the decision is unlawful due to the inadequacy of the commission's rules and their improper application.

{¶ 2} We hold that the commission appropriately relied on the relevant statutory amendments and created a lawful and reasonable test to effectuate those changes. Likewise, we affirm the commission's factual determinations in approving CBT's application.

## BACKGROUND

{¶ 3} On November 4, 2005, Am.Sub.H.B. No. 218 ("H.B. 218") took effect, amending provisions of the state telecommunications law. Affected statutes include R.C. 4905.04, 4927.02, 4927.03, and 4927.04. This appeal deals with changes to R.C. 4927.02 and 4927.03, which set forth the requirements for exemption from regulation and alternative regulation.

{¶ 4} The amendments to R.C. 4927.02 provide that it is the policy of this state to rely on market forces and their influence in maintaining just and reasonable rates, to consider the regulatory treatment of competitive services in determining the scope of regulation by the commission, and to refrain from unduly favoring or disadvantaging providers of competing regulated services. R.C. 4927.02(B) directs that the commission use these policy guidelines to implement R.C. 4927.03 and 4927.04 and to reduce or eliminate the regulation of telephone companies under those sections.

{¶ 5} Together with these new policy considerations, the General Assembly expanded the services eligible for exemption from regulation or for alternative regulation in R.C. 4927.03(A)(1) by including basic local exchange service

("BLES") offered by incumbent local exchange companies ("ILECs"). Previously, the statute allowed exemption or alternative regulation for any service other than BLES.[1] R.C. 4927.03(A)(1) allows phone companies exemption from traditional rate regulation when it is in the public interest and either the utility is subject to competition for that service or customers have reasonably available alternatives. R.C. 4927.03(A)(1)(a) and (b). In addition, the commission must find that there are "no barriers to entry." R.C. 4927.03(A)(3). R.C. 4927.03(C) allows the commission to abrogate or modify orders awarding alternative regulation if the findings it relied on are no longer valid and if that action is in the public interest.

{¶ 6} In response to H.B. 218, the commission established rules governing alternative regulation to cover basic local exchange service. See Ohio Adm.Code 4901:1–4–01 et seq.; *In the Matter of the Implementation of H.B. 218 Concerning Alternative Regulation of Basic Local Exchange Service of Incumbent Local Exchange Telephone Companies* (Mar. 7, 2006), PUCO No. 05–1305–TP–ORD, 2006 WL 707476 ("*05–1305* "). These rules cover everything from the geographic area to be considered for awarding alternative regulation to the requirements an applicant must meet to qualify for alternative regulation. The rules became effective on August 7, 2006.

{¶ 7} In Ohio Adm.Code 4901:1–4–10(C), the commission established four competitive-market tests to determine eligibility for alternative regulation. An applicant must satisfy at least one of these tests. The test relevant to this appeal is the test set forth in Ohio Adm.Code 4901:1–4–10(C)(4) ("Test 4"). Test 4 requires the applicant to demonstrate that in each requested exchange area, the applicant has lost at least 15 percent of its total residential access lines since 2002. The applicant must also demonstrate the presence of at least five unaffiliated facilities-based alternative providers serving the residential market.

{¶ 8} CBT filed an application for alternative regulation, claiming that it had lost 18.6 percent of its residential lines in the Cincinnati exchange and 18.4 percent in Hamilton since 2002 and the presence of the requisite five alternative providers. On November 28, 2006, the commission issued an opinion and order ("*Nov. 28 Opinion* ") approving the application filed by CBT seeking alternative regulation in CBT's Cincinnati and Hamilton exchanges. It is from this order that OCC appeals.

---

1. Basic local exchange service is defined in R.C. 4927.01(A) and includes such features as dial tone, access to 9–1–1, access to an operator, listing in a directory, caller-identification-blocking service, access to relay service, and access to networks of other companies (i.e., long distance and toll providers).

## STANDARD OF REVIEW

{¶ 9} R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, this court will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record that it shows misapprehension, mistake, or willful disregard of duty. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371.

{¶ 10} This presents a heavy burden for a party challenging an order, because this court consistently defers to the commission's judgment in matters that require the commission to apply its special expertise and discretion with regard to factual matters. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 180, 749 N.E.2d 262; *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 108, 75 O.O.2d 172, 346 N.E.2d 778. In *Stephens v. Pub. Util. Comm.*, 102 Ohio St.3d 44, 2004-Ohio-1798, 806 N.E.2d 527, we were presented with a factual finding by the commission under R.C. 4927.03(A)(1)(a) that a telephone company was "subject to competition" for purposes of eligibility for exemption from traditional regulation. We stated that if "a finding or decision of the commission is supported by sufficient record evidence, as is the case in this appeal, the court will not weigh the evidence and substitute its judgment for that of the commission." Id. at ¶ 16, citing *Time Warner AxS v. Pub. Util. Comm.* (1996), 75 Ohio St.3d 229, 233, 661 N.E.2d 1097. As in the present case, the *Stephens* case dealt with a factual determination under R.C. 4927.03(A)(1), under which the commission must determine either that the applicant was subject to competition with respect to such service or that customers had reasonably available alternatives.

{¶ 11} We note that although we defer to factual findings and conclusions of the commission, the court has "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922. Nevertheless, we have explained that we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## ANALYSIS

### Stand–Alone Service

{¶ 12} OCC argues that the commission's analysis of what constitutes a competitive service under Test 4 is too broad. Specifically, OCC's first proposition of law asserts that when determining whether an applicant is "subject to competition," the commission should not consider bundled-service offerings, but should restrict the field of potential competitors to providers of stand-alone basic service. OCC argues that phone companies offering packages that include basic local exchange service were already eligible for alternative regulation before the H.B. 218 amendments and that the amendments deal solely with basic stand-alone service. OCC asserts that therefore the commission can compare service only from a competitor that offers stand-alone basic local exchange service.

{¶ 13} The commission found that customers receiving basic local exchange service as part of a package are still considered basic local exchange service customers. Thus, the providers of those services are potential competing providers. The commission admits that these competing providers might not currently offer terms and conditions identical to those offered by a stand-alone service, but functionally equivalent or substitute services are readily available at competitive rates, terms, and conditions. The commission argues that R.C. 4927.03(A)(1) does not restrict the analysis of competition and reasonably available alternatives to services that are exactly like the applicant's basic local exchange service.

{¶ 14} The commission relied on the evidence that CBT has lost local exchange service customers in the presence of alternative providers and that those customers clearly view the other providers' rates, terms, and conditions to be a competitive and reasonably available alternative to CBT's basic service. The commission suggests that it is reasonable to assume that customers would not have switched from CBT's basic local exchange service had they not considered the alternative providers' rates, terms, and conditions to be competitive.

{¶ 15} In H.B. 218, the General Assembly amended R.C. 4927.02, which sets forth Ohio's policy for alternative regulation, in concert with R.C. 4927.03, which sets forth the requirements for eligibility. R.C. 4927.02(B) directs the commission to consider the policy factors in implementing alternative regulation. Such factors include reliance on market forces to maintain just and reasonable rates and consideration of the regulatory treatment of competing and functionally equivalent services when determining how and whether to regulate providers. R.C. 4927.02(A)(2) and (6). The policy of relying on market forces rather than government regulation to keep rates just and reasonable indicates a legislative preference for reducing or eliminating regulation of telephone companies.

{¶ 16} It is in the framework of these changes that we review the relevant statutory provisions. R.C. 4927.03(A)(1)(a) and (b) require that before awarding alternative regulation to an applicant, the commission find either that the applicant is subject to competition for the service or that there are reasonably available alternatives to the service. R.C. 4927.03(A)(2)(c) directs that the commission, in making this finding, shall consider whether alternative providers are able to make "functionally equivalent or substitute services" readily available on competitive terms.

{¶ 17} The key issue is what constitutes "competition" within the meaning of R.C. 4927.02(1)(a)'s requirement that the applicant for alternative regulation be "subject to competition." If bundled services are providing competition to basic service, then the commission must consider those packages in determining whether the applicant is subject to competition. The question comes down to which services compete with basic service.

{¶ 18} OCC's argument that only basic service competition may be considered fails to recognize the legislative guidance provided by the H.B. 218 amendments. In amending R.C. 4927.02, the General Assembly provided the commission with new factors to consider when determining whether an applicant is "subject to competition," and those factors include consideration of the larger environment of telephone service providers, specifically, "[t]he ability of alternative providers to make functionally equivalent or substitute services readily available" on competitive terms. R.C. 4927.03(A)(2)(c).

{¶ 19} The commission established that bundled services provide competition to basic phone service. The commission determined that customers are switching service in the presence of competitors and that it is plausible to assume that those customers find the alternative services to be adequate substitutes for CBT's services. The court will not reverse or modify a commission decision as to questions of fact in cases in which the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. OCC shows that the alternative providers' services are different and offered at a variety of prices, but it does not overcome the commission's finding that those services are providing reasonable competitive substitutes for basic local exchange service. We defer to the commission's expertise on this matter. Accordingly, we reject OCC's argument.

### Extent of Market Presence

{¶ 20} In its second proposition, OCC challenges the commission's application of Test 4, which awards alternative regulation if, for each relevant exchange area,

the applicant shows, inter alia, the presence of at least five qualified alternative providers serving the residential market. OCC asserts that the commission improperly included providers who serve only a portion of the exchange reviewed, which does not properly reflect statutory requirements. Failure to serve the entire exchange means that the service is not "readily available" within the meaning of R.C. 4927.03(A)(2)(c).

{¶ 21} OCC points out that the commission conceded in its order that Time Warner and Current Communications do not serve the entirety of either the Cincinnati or Hamilton exchange, stating that Time Warner covers a "majority" of the exchange areas and that Current Communications serves in "some areas of the Cincinnati exchange." OCC also argues that the commission ignored OCC's evidence that wireless carriers are not "readily available" "functionally equivalent or substitute services," because they cannot guarantee coverage at all locations due to varying and unreliable signal strength.

{¶ 22} The commission counters that there is no requirement that all alternative providers offer ubiquitous service throughout the exchange. The commission rejected OCC's argument as a "narrow interpretation" that would require the relevant market to be reduced from an exchange to an area as small as a city block to ensure that every single customer has access to all alternate providers. The commission stated that OCC's argument would even require the commission to test wireless coverage in individual homes.

{¶ 23} This dispute is rooted in the geographic area the commission adopted in its rules as the "relevant market" for purposes of R.C. 4927.03(A)(2)(b), which requires the commission to consider the "extent to which services are available from alternative providers in the relevant market." "Relevant market" was defined in the *05-1305* rulemaking proceeding as a telephone exchange, which in turn is defined as "a geographical service area established by an [incumbent local exchange provider] and approved by the commission, which usually embraces a city, town, or village and a designated surrounding or adjacent area. There are currently seven hundred thirty-eight exchanges in the state." Ohio Adm.Code 4901:1-4-01(M).

{¶ 24} We affirm the commission's finding that alternative providers have services "readily available" in CBT's exchanges. The commission established the exchange area to judge the overall presence in that area, not a subset of that area. The commission found no requirement in the law or in its rules that an alternative provider must serve 100 percent of the relevant market. The commission points out that OCC supported using the telephone exchange as the relevant market in the *05-1305* rulemaking case. The area is small enough to share common characteristics while still providing years of historical data. Thus,

it is reasonable to accept the commission's determination to judge the area as a whole.[2]

### "Presence" of Alternative Providers

{¶ 25} OCC's first proposition questions the legitimacy of Test 4. It argues that by requiring only the "presence" of alternative providers in the requested exchange, the test fails to include any consideration of the size of such providers or other indicators of market power such as market share or growth, as required by R.C. 4927.03(A)(2). OCC's concern is that the mere presence of an alternative provider in the market does not show that the provider is able to contribute to a "healthy and sustainable" competitive market. See R.C. 4927.02(A)(2). OCC suggests that longevity is a better indicator of market power.

{¶ 26} The commission disagreed, stating in its order that Test 4 reflects a more appropriate measure for consideration: the overall state of the competitive market as demonstrated by the presence of a significant number of competitive providers in the relevant market and by the applicant's loss of a considerable share of its access lines. The commission found that factors like longevity in the market, while noteworthy, did not have a direct bearing on the state of the competitive market at any given point in time. The commission found that objective criteria, such as the required presence of several facilities-based providers, are more significant in demonstrating a healthy, sustainable market. The actual presence of facilities-based providers demonstrates a greater commitment by those alternative providers to remain in the market as competitors.

{¶ 27} R.C. 4927.03(A)(2)(d) requires the commission to consider "[o]ther indicators of market power, which may include market share, growth in market share, ease of entry, and the affiliation of providers of services." Ultimately, this is a factual determination. In essence, OCC is attempting to attack a factual determination by the commission. But OCC has failed to show that the commission's decision is unsupported by sufficient record evidence, and this court will not substitute its judgment for that of the commission. *Stephens v. Pub. Util. Comm.*, 102 Ohio St.3d 44, 2004-Ohio-1798, 806 N.E.2d 527, ¶ 16.

{¶ 28} Moreover, we defer to the commission's expertise in deciding the most effective means of implementing the legislature's intent. Here, the commission's approach to measuring competition recognizes the practical realities of the market. For instance, by requiring that alternative providers be facilities-based, the commission ensures that alternative providers have demonstrated a real,

---

2. In so doing, we note that Test 4 also requires a showing of a decrease of at least 15 percent of residential access lines since 2002. The adequacy of the test cannot be judged solely on the number of alternative providers. We reject OCC's argument that an alternative provider must have a ubiquitous presence in the exchange.

long-term commitment to the relevant market due to investment in plant and equipment.

{¶ 29} Understanding of the current market is crucial to the analysis here. Again, we defer to the commission's expertise in this regard. The commission complied with R.C. 4927.03(A)(2) by devising a test that it reasonably believed measures the presence of competition in the relevant market and made a factual finding based on the record and its expertise. We reject OCC's challenge to the commission's determinations.

### Access-Line Loss

{¶ 30} In its third proposition, OCC also challenges the relevance of the applicant's access-line losses since 2002 as a prong of Test 4. The line-loss prong of Test 4 requires a showing that the incumbent lost at least 15 percent of its residential access lines in an exchange since 2002.

{¶ 31} OCC questions how the line-loss provision satisfies the statutory criteria in R.C. 4927.03(A). There is no question that CBT lost over 15 percent of its access lines since 2002. The only issue is whether that fact establishes that the applicant is "subject to competition" or that customers have "reasonably available alternatives" as required by R.C. 4927.03(A)(1).

{¶ 32} The commission discussed the different factors it weighed when fixing on lost access lines as a factor in Test 4. The commission stated in its order that in exercising its judgment and discretion, it determined that "a minimum 15 percent residential access line loss in a given exchange, considering all the possible causes for such loss, accompanied by the presence of at least five unaffiliated facilities-based alternative providers serving the residential market in that exchange, is sufficient to justify alternative regulation." Further, "[t]he line loss requirement measures market power, the level of competition that [an applicant] faces from alternative providers, and the availability of competing alternative services" in each exchange. Moreover, the commission found that the line-loss factor is practical and easily implemented, using readily available data. The commission also incorporated OCC's suggestion to move the time frame to count the lines lost from 1996 to 2002, which takes into account the migration of lines affiliated with the beginning of the unbundled network element platform offerings in Ohio. Finally, the commission concluded that the two factors in Test 4, when combined, "gauge[ ] the sustainability of competing residential providers in the subject market area."

{¶ 33} The General Assembly required the commission to develop rules to carry out the amendments. R.C. 4927.03(D). The amendments require consideration of the regulatory treatment of competing and functionally equivalent services in determining the scope of regulation of services subject to commission

jurisdiction under R.C. 4927.02(A)(6). The changes also require that the commission ensure that it does not unduly favor or advantage any provider or unduly disadvantage providers of competing and functionally equivalent services under R.C. 4927.02(A)(7). Therefore, the commission had to interpret the statutory criteria and develop a method to evaluate competition beyond its regulatory authority.

{¶ 34} The commission's finding that Test 4 adequately judges alternative competition by combining the presence of at least five unaffiliated facilities-based competitors with a significant loss of access lines is reasonable. The commission's rules incorporate the market reality that there are some forms of competition that the commission has no power to regulate or formally review. Accordingly, the commission interpreted the intent of the General Assembly and developed a test to determine the level of competition and the availability of alternative providers regardless of regulatory oversight. The court has explained that it may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d at 110, 12 O.O.3d 115, 388 N.E.2d 1370.

{¶ 35} Moreover, the legislature reserved to the commission the right to modify or abrogate the alternative regulatory treatment should any evidence show that the findings relied upon are no longer valid. R.C. 4927.03(C). OCC can notify the commission if any conditions change.

{¶ 36} We affirm the commission's finding on the adequacy of Test 4 and its conclusion that CBT satisfied the line-loss portion of that test. Accordingly, we reject OCC's proposition of law.

### Barriers to Entry

{¶ 37} OCC's fourth proposition asserts that CBT failed to show a lack of barriers to entry for competitors offering stand-alone basic service and that the commission's rules improperly permit an award of alternative regulation without such a showing. R.C. 4927.03(A)(3) provides that no award of alternative regulation shall be made under R.C. 4927.03(A)(1) unless the commission finds that "there are no barriers to entry."

{¶ 38} The commission established its view on the lack of barriers in the *05–1305* rulemaking case. The commission stated that all companies attempting entry into a new market are confronted with at least some difficulties. Therefore the issue becomes whether these difficulties can be overcome by competitors or whether market conditions present true barriers that prevent or significantly

impede entry beyond those risks and costs normally associated with market entry.

{¶ 39} OCC asserts that the commission's standard for finding no barriers is too low. OCC argues that the commission has improperly interpreted "no barriers" to mean "no significant barriers."

{¶ 40} Factually, the commission did not find any evidence in the record of any barriers to entry present in the requested exchanges that might bar providers from entering those markets. The commission found that the effects of the potential barriers pointed out by OCC's expert in the *05–1305* rulemaking case, Dr. Roycroft, are minimized by federal and state laws. In addition, the commission found that Dr. Roycroft failed to identify a single barrier to entry applying specifically to either of CBT's two requested exchanges.

{¶ 41} We find that these issues involve another factual determination by the commission. The commission developed an independent test to assist it in making its factual determinations under the statute. The commission's rule for determining the presence of alternative providers and access lines lost (i.e., customers lost) is a reasonable indicator that there are no barriers preventing entry in the exchange.

{¶ 42} OCC's interpretation of the lack-of-barriers requirement would impose an insurmountable burden on applicants for alternative regulation. No market is completely barrier-free. OCC's suggested test, in which the commission would have to find that the market presents no difficulties or risks for new entrants, would place the alternative regulation contemplated by the legislature out of reach for most applicants.

{¶ 43} In establishing the criteria for determining the absence of barriers, the commission identified those factors that it believes are significant for the purpose of complying with the intent of H.B. 218, while at the same time not making the test so demanding that alternative regulation as contemplated by H.B. 218 would be unattainable. H.B. 218 provided no definition of "barrier" and no criteria for finding a lack of barriers. The commission pointed out, and we agree, that although the legislature provided general guidance for granting alternative regulation, "the ultimate decision-making authority regarding that implementation was left to the Commission." We cannot accept OCC's contention that Test 4 fails to properly address the absence of barriers to entry. And the commission's factual finding, that in this case CBT provided sufficient evidence to establish those criteria, will not be disturbed by this court.

## Public Interest

{¶ 44} R.C. 4927.03(A)(1) requires that the commission find that alternative regulation is in the public interest. OCC argues that the commission granted

alternative regulation to CBT without an adequate showing that such regulation is in the public interest. OCC points out that under the statutes prior to the recent amendments, applicants for alternative regulation were required to make certain "public interest" commitments. OCC requested that CBT be required to make additional commitments and asserts that the commission erred in failing to require additional commitments in the rules it promulgated under H.B. 218.

{¶ 45} The commission responded that in a competitive environment, further commitments are not appropriate, and the market itself will encourage innovation and generate consumer benefits. The commission found that competition will provide appropriate incentives to maintain affordability, innovation, diversity of choice, and other public benefits.

{¶ 46} While the commission reiterated its belief in the importance of ensuring that the largest numbers of residents have access to high-quality telephone service regardless of income or geographic location, it also recognized the legislature's direction that market forces be allowed to create an environment that will promote competitive pricing, thereby maintaining just and reasonable rates. The commitments required of applicants for alternative regulation, set forth in Ohio Adm.Code 4901:1-4-06 et seq., represent the commission's attempt to strike a balance between regulation and free-market competition.

{¶ 47} R.C. 4927.02 requires the commission to consider the regulatory environment for competing services and to reduce the regulation of telephone companies in the presence of increasing competition. In establishing its rules, the commission looked to the policy of the state set forth in R.C. 4927.02(A) and determined that certain measures, such as capping annual rate increases, imposing minimum access requirements for low-density areas, and ensuring economic assistance to eligible consumers, provided the needed protection to consumers without unduly interfering with the market and without disadvantaging local exchange carriers. The commission's position gives meaning to the H.B. 218 policy changes in R.C. 4927.02, which identifies the General Assembly's view of the public interest.

{¶ 48} Moreover, the public-benefit finding is a factual determination made by the commission. Its finding that CBT had met the requirements for a showing of public interest is not one that will be disturbed by this court absent a demonstration that it is clearly unsupported by the record. *AT & T*, 88 Ohio St.3d at 555, 728 N.E.2d 371. OCC has made no such showing.

{¶ 49} Having considered the arguments and the record carefully, we affirm the commission's finding that CBT's application is in the public interest and reject OCC's argument.

## CONCLUSION

{¶ 50} Ultimately, OCC is appealing Test 4, the rule that the commission adopted to streamline its review for alternative treatment under the statute. The rule, as applied to the facts in this case, satisfies the statutory factors needed to award alternative treatment. The commission made appropriate factual determinations. OCC's arguments should be rejected and the commission order affirmed.

Decision affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Janine L. Migden–Ostrander, Consumers' Counsel, and Daniel C. Bergmann and Terry L. Etter, Assistant Consumers' Counsel, for appellant.

Marc Dann, Attorney General, and Duane W. Luckey, William L. Wright, and Stephen A. Reilly, Assistant Attorneys General, for appellee Public Utilities Commission.

Douglas E. Hart, for intervening appellee Cincinnati Bell Telephone Co., L.L.C.