ELYRIA FOUNDRY COMPANY, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Elyria Foundry Co. v. Pub. Util. Comm.,*
118 Ohio St.3d 269, 2008-Ohio-2230.]

(No. 2007–0860—Submitted January 22, 2008—Decided May 15, 2008.)

CUPP, J.

{¶ 1} This is an appeal as of right by Elyria Foundry Company ("Elyria") from an order of the Public Utilities Commission of Ohio ("PUCO" or "commission") concerning the interruptible electric service program offered by the Ohio Edison Company. Electric customers that contract for this program agree to have their service subject to interruption in exchange for a discount on the cost of service. In contrast, "firm service" customers are provided a priority service without interruption. Elyria receives a portion of its electric service on an interruptible basis.

{¶ 2} Elyria takes issue with the method that was used to determine interruptions of its service in 2005. In 2005, Elyria Foundry had a portion of its electric supply interrupted on 44 days for a total of 645 hours. Previously, Elyria had averaged about four interruptions a year. Elyria contests Ohio Edison's internal policy that resulted in these interruptions, asserting that the program is flawed and not properly filed with the commission as required by the law.

{¶ 3} Elyria provides no evidence that Ohio Edison's internal policy contradicted the interruptible program outlined in the company tariffs in its appeal of the commission order. Elyria also fails to demonstrate to the court that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Thus, we affirm the commission's opinion and order.

## STATEMENT OF FACTS

{¶ 4} In Ohio Edison's territory, customers receive interruptible service under one of three tariff provisions. The relevant section in this appeal is Rider 75 Ohio Edison's Tariff PUCO No. 11.

{¶ 5} Under Rider 75, Ohio Edison may "interrupt service to the customer's interruptible load whenever the incremental revenue to be received from the

customer is less than the anticipated incremental expense to supply the interruptible energy for the particular hour(s) of the interruption request."

{¶ 6} When an economic interruption is requested by Ohio Edison, the interruptible customer can (1) arrange for service from another supplier, (2) purchase replacement power from Ohio Edison at a prearranged price, (3) ignore the notice and buy replacement power from Ohio Edison at the highest market price, or (4) decrease its usage in accordance with Ohio Edison's firm-load responsibilities.

{¶ 7} Ohio Edison developed a policy of not calling for an economic interruption until all of its interruptible customers are affected ("2001 policy"). The 2001 policy invokes an interruption when, for at least three consecutive hours, incremental out-of-pocket costs to supply power exceed a "strike price" of $85 (changed to $65 in 2003) per megawatt hour ("MWh") and the current or expected load obligations exceed available planned resources by 300 megawatts or more. The strike price represents approximately the highest incremental revenue received from any interruptible customer.

{¶ 8} Ohio Edison's interruptible service is administered by FirstEnergy Solutions Corporation ("FES"), an unregulated electric marketer and wholly owned subsidiary of FirstEnergy Corporation ("FE"). FES is the owner of virtually all of the generation assets formerly owned by FE, and it provides all electricity needed by the FE operating companies under a power-supply agreement ("PSA") approved by the Federal Energy Regulatory Commission ("FERC").

{¶ 9} The number of economic interruptions Elyria Foundry experienced each year from 1995 through 2004 varied, but it was never more than 11. Elyria Foundry received a notice from Ohio Edison in 2005 warning that the number of interruptions under Rider 75 might increase. Ohio Edison explained that the previous few years had experienced fairly mild winters and that FERC's changes in the national structure of the electric system, combined with the uncertainty of prices in the power, gas, and coal markets, might trigger interruptions more frequently. Then, the state of Ohio experienced the hottest June and fifth-hottest July in the past 30 years in 2005, and the first 21 days of December 2005 were the coldest ever recorded in Ohio. In addition to the weather conditions, coal-supply issues in the Midwest and oil and natural gas shortages in the aftermath of Hurricane Katrina and other hurricanes in the Gulf region caused price increases.

{¶ 10} Elyria filed a complaint at the commission concerning the application of the internal 2001 policy after the frequency of the interruptions increased from an average of four days a year to 44 days in 2005. On January 17, 2007, following a hearing and the submission of briefs, the commission issued its opinion and order in its proceeding ("*Jan. 17th Order*"). The commission found that Elyria

did not provide sufficient evidence either that Ohio Edison's charges under Rider 75 had violated any applicable statute, regulation, or guideline or that Ohio Edison had failed to comply with any filing or notice requirement concerning its implementation of Rider 75.

{¶ 11} On May 10, 2007, Elyria filed a notice of appeal with this court. Ohio Edison intervened as an appellee. The cause is before this court on an appeal as of right.

## STANDARD OF REVIEW

{¶ 12} A PUCO order will be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable. R.C. 4903.13. See also *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. " '[T]his court will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty.' " *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29, quoting *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. Furthermore, the court will not reverse a commission order absent a showing by the appellant that it has been or will be harmed or prejudiced by the order. *Myers v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 299, 302, 595 N.E.2d 873.

{¶ 13} The court has "complete and independent power of review as to all questions of law" in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922. The court has explained that it may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## ARGUMENT

### Proposition of Law No. I

{¶ 14} Elyria argues that the incremental costs used by Ohio Edison to determine the need for requesting economic interruptions are unlawful. Specifically, Elyria argues that the PSA (power-supply agreement) and its formula were

not used to determine incremental expenses upon which to request economic interruptions. Elyria asserts instead that "the incremental expenses were based on the total, unallocated, actual purchased power costs of FES." In other words, Elyria claims that Ohio Edison included the electric load in FES's unregulated contracts when deciding whether to issue an economic interruption for Ohio Edison's regulated customers.

{¶ 15} Elyria asserts that there are up to 3,000 megawatts of competitive market sales by FES that should not have been included in determining the need for interruptions for Ohio Edison's Rider 75 interruptible customers. Consequently, according to Elyria, the commission allowed Ohio Edison to request an excessive number of economic interruptions during 2005. Elyria also claims that those market customers failed to pay their portion of the increased replacement power rate.

{¶ 16} Elyria's argument is unavailing. Elyria is an interruptible customer that chose to be a part of the discount system. Rider 75 deals with Ohio Edison's actions once the supply of electricity is in question. Implicit in the interruptible program is the belief that firm customers deserve to receive service before interruptible customers.

{¶ 17} The commission cites its generic review of interruptible programs in which it developed guidelines to provide a base for utilities to develop these programs. *In the Matter of Interruptible Electric Service Guidelines, Pursuant to the Agreement by Participants in the Commission Roundtable on Competition in the Electric Industry* (Dec. 22, 1998), PUCO No. 95–866–EL–UNC ("*Guideline Order*"). In the *Guideline Order*, the commission recognized that the key to interruptible programs is the distinction between firm and interruptible service. Id. at 8–9. The commission also recognized that " '[e]ach utility has an obligation to maintain system integrity and service to firm * * * customers, and it is important to remember that [interruptible] customers receive substantial discounts for accepting [the] risk of service interruption.' " *Jan. 17th Order* at 9, quoting *Guideline Order* at 8–9.

{¶ 18} It is this policy view that interruptible service should not be prioritized over firm service that appropriately led the commission to find that it is not unreasonable to consider all of the firm obligations of FES, including those outside of the PSA, in determining the costs to Ohio Edison of serving interruptible customers. It was reasonable for the commission to rely on its precedent that helped define the boundaries of the interruptible program. After discussing the *Guideline Order*, the commission determined that it is reasonable to look at all firm-service commitments of the provider to ensure that those customers are served first.

{¶ 19} Elyria wants the discounted rates and therefore is willing to take the risk of interruption. Once a customer gives up the right to firm service, it falls into the bucket of interruptible customers and is subject to interruptions and inconveniences during the highest peaks in demand on the electric system. The fact that electric suppliers have regulated and unregulated responsibilities does not matter. Elyria was not required to open itself to the risk of interruptible service. In fact, in its *Jan. 17th Order*, the commission suspended the onerous opt-out provision for interruptible customers to give Elyria and others a one-time opportunity to move back to firm service without penalty. Elyria chose to stay in the program.

{¶ 20} Ohio Edison's actions comply with the scope of Rider 75 and previous commission decisions on interruptible programs. The commission established the reasonableness of taking FES's entire electric load into account when determining economic interruptions. Elyria failed to provide any evidence that Ohio Edison's actions or its 2001 policy contradicts Rider 75. Elyria's proposition of law, therefore, must be rejected.

### Proposition of Law No. II

{¶ 21} Elyria argues that Ohio Edison's utilization of its 2001 policy is a rate-setting practice that was not approved under R.C. 4909.18 and was not published under R.C. 4905.30. Elyria argues that during economic interruptions, customers are offered replacement/buy-through power rates that are not approved by the commission.

{¶ 22} R.C. 4909.18 requires a written application "to establish any rate * * * or to modify * * * any existing rate * * * or any regulation or practice affecting the same." Elyria incorporates a number of the common definitions of the words in R.C. 4909.18 to support its position that any effect on rates in any manner is required to be included in a tariff and not in an informal policy.

{¶ 23} We do not agree with Elyria's argument. Ohio Edison's interruptible program was approved by the commission as set forth in its tariffs under Rider 75. Elyria had the option to purchase firm electric service at the standard price. Instead, Elyria elected to accept some risk and take service under an interruptible tariff. The terms of that interruptible risk/benefit service are defined in Rider 75. The risk of accepting that discount is that at some point, the customer is subject to the highest cost of electric service if it chooses to run at full power at peak load times. Everything is defined in the commission-approved Rider 75, and therefore no new rate is being established.

{¶ 24} The 2001 policy is an internal operating procedure, and Elyria's attacks on the 2001 policy are misplaced. Tariff provisions define the programs offered by a regulated utility. However, tariffs are not a standard operating procedure

manual for the utility. Utilities develop internal policies to run their day-to-day business. As detailed in the record, the 2001 policy streamlines the administrative process and enables FES to act timely and efficiently when economic interruption conditions are present. The policy also minimizes the need for contact between the regulated (Ohio Edison) and the unregulated (FES) as required under R.C. 4928.17 and the commission's code-of-conduct rules.

{¶ 25} The 2001 policy specifies that all contract and tariff restrictions must be followed and that nothing in the policy undermines or diminishes tariff or contractual rates. Thus, nothing in the 2001 policy can contradict the rates and terms in Rider 75. The 2001 policy exists as a checklist, outlining the internal mechanics of Ohio Edison's process to carry out its optional right to interrupt customers' service as outlined in Rider 75. We reject Elyria's second proposition of law.

### Proposition of Law No. III

{¶ 26} Elyria argues that it is disadvantaged by Ohio Edison's policy to interrupt all interruptible customers at the same time, for the same duration, and replace power at the same cost. Elyria argues that the uniform interruptible strike price of $65/MWh discriminates against Elyria as prohibited by R.C. 4905.35. R.C. 4905.35 prohibits any utility from giving any undue or unreasonable preference or advantage to any customer. Elyria states that the use of a single interruptible price resulted in its paying a much higher incremental rate to Ohio Edison for a like and contemporaneous service that was interrupted under the same circumstances and conditions as the service to customers paying less.

{¶ 27} The $65/MWh strike price represents the highest incremental rate paid by any interruptible customer. The lowest rate paid by an interruptible customer is around $30/MWh. Elyria takes issue with the fact that customers paying the lower rate were not interrupted until more than 100 percent of their incremental expense was surpassed. Elyria argues that that policy discriminates against customers like itself who pay $51.34/MWh.

{¶ 28} The commission rejected Elyria's argument, finding no evidence of unlawful or prejudicial treatment under R.C. 4905.35. The commission points out that the strike price is not a rate but rather a trigger point used to indicate a need for service interruption. At that point, Elyria can avoid paying the higher electricity costs by seeking supply elsewhere or shutting down operations. Elyria can also choose to ignore the call for an interruption. If it chooses to ignore or "buys through" the interruption, it must pay the market replacement cost to Ohio Edison. That process was approved by the commission when Rider 75 was filed.

{¶ 29} Elyria fails to provide any evidence that the 2001 policy contradicts the approved tariff. Elyria also fails to demonstrate that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Elyria is accepting service under an interruptible program. Elyria has a right to the interruptible rate as long as no interruption is required. Once the interruption is necessary, then Elyria's ability to negotiate or receive differentiated treatment is limited to its options of curtailing use, arranging a third-party provider, or purchasing power from Ohio Edison. Otherwise, under Rider 75, the price to secure electric service for all interruptible customers is left to the market at the time.

{¶ 30} The 2001 policy does not discriminate against any particular interruptible customer. Ohio Edison developed a neutral policy that would not interrupt any customers until all customers being served under the plan were subject to an economic interruption. This consistent policy has the benefit of minimizing service interruptions until the problem affects the entire class of customers. The policy also sets a predetermined strike price, ensuring that no customers will be singled out. The single strike price simply recognizes the interruptible customers as a single class of customers facing interruptions under the same terms. Rider 75 is written as a neutral process to give the interruptible customer options to get through the interruption and back to its discounted interruptible rate.

{¶ 31} We reject Elyria's third proposition of law.

### Proposition of Law No. IV

{¶ 32} In its fourth proposition of law, Elyria argues that the commission violated R.C. 4903.09, which requires the commission to set forth the factual basis and reasoning in its decision. Specifically, Elyria argues that the commission did not include adequate record citations when adopting Ohio Edison's position in response to an argument made by Elyria on rehearing.

{¶ 33} After the March 14 entry on rehearing, Elyria filed a second rehearing request, arguing that the commission failed to provide the factual basis and reasoning used for agreeing with Ohio Edison's position on Elyria's mathematical arguments. Elyria argued that Ohio Edison's calculations of incremental costs were incorrect in that they failed to allocate the cost per MWh based on the percentage of total purchased power consumed by Ohio Edison's customers. Ohio Edison responded that Elyria's mathematical arguments were in error.

{¶ 34} The commission agreed with Ohio Edison on this issue and denied the ground for rehearing, citing the statement in Ohio Edison's memorandum in opposition that "if the total cost is to be allocated based on the percentage of consumption to get the unit cost, so too must the volume." Elyria argues that

the commission's adoption of Ohio Edison's argument without record support violates R.C. 4903.09.

{¶ 35} We find no merit in Elyria's fourth proposition of law. The commission pointed out the mathematical error made by Elyria. The correction to the mathematical formula showed all that was needed to reject the argument in the rehearing entry. The commission pointed out Elyria's mistake and reaffirmed its order.

{¶ 36} The commission's order adequately supports its findings and provides the court with an adequate record to understand the commission's rationale underlying its decision on appeal. The commission's order supports the commission's findings in compliance with R.C. 4903.09.

## CONCLUSION

{¶ 37} Elyria paid about $450,000 less for electric service in 2005 than if it had accepted electric service as a firm-service customer. In spite of these savings, Elyria challenges the basis of the interruptible system and seeks to change how the program is administered. It takes issue with the program despite the record showing the factors necessitating an increase in economic interruptions, such as the extreme weather conditions.

{¶ 38} The interruptible program is premised on a company's business decision to pay lower rates on a regular basis in exchange for the risk of being interrupted at the highest usage or most expensive times for electric usage during the year. Complaints about how the utility implements Rider 75 must show that the process contradicts or goes outside of the approved rider. Elyria fails to prove that Rider 75 was violated.

{¶ 39} We affirm the commission's order.

Order affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

———————

Craig Smith, for appellant.

Thomas R. Winters, First Assistant Attorney General, and Duane W. Luckey, John H. Jones and William L. Wright, Assistant Attorneys General, for appellees.

Kathy J. Kolich, Senior Counsel, FirstEnergy Service Corporation, for intervening appellee.